**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

MARISSA TEJEDA,

       CASE NO.:

    Plaintiff,

v.

7-ELEVEN, INC.,

    Defendant.

William R. Frush (P87016)
F&S LAW, PLLC
Attorney for Plaintiff
77 Monroe Center St NW
Suite 600 - #1028
Grand Rapids, MI 49503
wfrush@fslawpllc.com
(248) 675-9192

## COMPLAINT

NOW COMES Plaintiff MARISSA TEJEDA ("Plaintiff"), by and through their attorney, F&S LAW, PLLC, and hereby states for their Complaint against Defendant 7-ELEVEN, INC. (hereinafter "Defendant") as follows:

## NATURE OF ACTION

This is an action for unlawful disability discrimination in violation of Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12181-12189, 28 C.F.R. Part 36, and the Michigan Persons with Disabilities Civil Rights Act ("PWDCRA"), MCL 37.1101 et seq. Plaintiff seeks remedies under federal and Michigan law for Defendant's failure to make its website accessible to individuals with disabilities. Plaintiff requests injunctive relief, compensatory damages, costs, and litigation expenses (including attorney's fees), as well as any other relief this Court deems fair and just.

**PARTIES**

1.      Plaintiff MARISSA TEJEDA ("Plaintiff") is a natural person and resident of Mecosta County in the State of Michigan.

2.      Plaintiff has a determinable physical impairment that substantially limits one or more major life activities, i.e., the major life activity of seeing, due to Plaintiff's blindness. Plaintiff thus qualifies as a member of a protected class of individuals under the PWDCRA, MCL 37.1103(d).

3.      Plaintiff is also a member of a protected class of individuals under the ADA pursuant to 42 U.S.C. § 12102(1)-(2), and 28 C.F.R. §§ 36.101 et seq.

4.      As a result of their disability, Plaintiff relies on screen-reading software and other assistive technologies/software to access digital content, including websites and mobile applications, and obtain goods and services on equal terms with the non-disabled public.

5.      Plaintiff uses a computer program called VoiceOver to utilize the internet. VoiceOver is a built-in screen reader on macOS that provides auditory descriptions of on-screen elements, permitting Plaintiff to navigate and interact with their computer (and the internet) using keyboard commands and spoken feedback.

6.      Defendant is a foreign profit corporation registered with the Department of Licensing and Regulatory Affairs to do business in the State of Michigan.

7.      Defendant's registered agent is Corporate Creations Network, Inc., with a registered office located at 28175 Haggerty Rd, Novi, MI 48377.

8.      Defendant is a franchise-driven company with over 10,000 locations operating throughout the United States.

F&S Law

2

9. At all relevant times, a franchise location under Defendant's brand was doing business at 2397 South Mission Street, Mount Pleasant, MI 48858.

10. At all relevant times, Defendant owned, maintained, operated, and/or controlled the following website related to its places of business: https://www.7-eleven.com. (hereinafter "Website" or "the Website"). The Website also includes a fully integrated delivery platform, marketed as "7NOW." Through 7NOW, customers can browse Defendant's product offerings, place orders, and arrange for Defendant to deliver those goods directly to their home or other location. The Website thus functions as both an online storefront and delivery portal, allowing customers to complete the entire transaction without visiting a physical location.

11. Defendant also offers a paid membership program that provides members with reduced or waived delivery fees, confirming that Defendant owns, controls, and derives direct revenue from the 7NOW delivery platform.

12. Defendant is the sole entity operating and controlling Defendant's Website; franchisees do not control or modify the Website. However, Defendant's Website facilitates public access to franchisees' locations, permitting consumers to (a) obtain information about Defendant's goods; (b) browse and purchase Defendant's goods or services; (c) engage in transactions that Defendant's franchisees ultimately fulfil at their physical places of business; and/or (d) complete transactions through Defendant's "7NOW" service to have goods delivered to consumers' homes.

13. Defendant's Website includes a "Store Locator" feature that allows customers to search for retail locations where Defendant's products are sold. This feature enables customers to enter their own location to find nearby stores operating under Defendant's brand. The Store Locator directly connects the Website to the physical places of public accommodation where

F&S Law

3

Defendant's goods are extended, offered, and sold, further demonstrating the substantial nexus between Defendant's online platform and brick-and-mortar sales establishments.

14.    Both Defendant and Defendant's franchisees operate places of public accommodation under the PWDCRA because they are businesses whose goods, services, facilities, privileges, advantages, and/or accommodations are extended, offered, sold, or otherwise made available to the general public. MCL 37.1301a.

15.    By operating and licensing the "7-Eleven" brand, establishing uniform operational standards for franchisees, and maintaining exclusive control over the Website through which franchisees' goods are advertised and sold, Defendant directly participates in and profits from the sale of goods and services made available to the public through its company-owned and franchisee-operated locations.

16.    Because Defendant's Website is an integral extension of Defendant's business operations—serving as the primary and exclusive digital gateway through which Defendant invites and solicits members of the general public including Plaintiff to browse and/or purchase Defendant's goods or services through Defendant's company-owned stores or Defendant's franchisees, Defendant's Website is also a place of public accommodation within the definition of the Michigan PWDCRA, MCL 37.1301(a).

17.    Defendant's company-owned places of business are places of public accommodation within the definition of Title III of the ADA, 42 U.S.C. § 12181(7)(B) and 42 U.S.C. § 12181(7)(E).

18.    Defendant's franchisees' places of business are places of public accommodation within the definition of Title III of the ADA, 42 U.S.C. § 12181(7)(B) and 42 U.S.C. § 12181(7)(E).

19.     Defendant's Website is a place of public accommodation within the definition of Title III of the ADA, 42 U.S.C. § 12181(7)(B) and 42 U.S.C. § 12181(7)(E).

## JURISDICTION AND VENUE

20.     Plaintiff incorporates by reference paragraphs 1 through 19 as if fully stated herein.

21.     This Court has original jurisdiction over Plaintiff's ADA claims pursuant to 28 U.S.C. § 1331(a): "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

22.     This Court has supplemental jurisdiction over Plaintiff's PWDCRA claims pursuant to 28 U.S.C. § 1367 because they are so related to Plaintiff's ADA claims that they form part of the same case or controversy.

23.     Venue is proper in the United States District Court for the Western District of Michigan, Southern Division, pursuant to 28 U.S.C. § 1391(b)(2) because this is the judicial district in which a substantial part of the events or omissions giving rise to this claim occurred. Plaintiff accessed Defendant's Website from their residence in Mecosta County, and Defendant conducts substantial business in Michigan through the sale of its products at retail establishments throughout the state, including Mecosta County.

## FACTUAL BACKGROUND

24.     Plaintiff incorporates by reference paragraphs 1 through 23 as if fully stated herein.

25.     On February 28, 2026, Plaintiff visited Defendant's Website to complete an online order from Defendant's store located at 2397 South Mission Street, Mount Pleasant, MI 48858; however, due to the accessibility errors present on the Website, they were unable to complete the order.

F&S Law

26.     Specifically, upon entering the Website, Plaintiff encountered multiple unlabeled buttons that created confusion and prevented them from navigating the Website efficiently.

27.     The Web Content Accessibility Guidelines ("WCAG") are internationally recognized technical standards providing accessibility accommodations for people with disabilities, including blindness and low vision, deafness and hearing loss, limited movement, speech disabilities, photosensitivity, and any combination thereof. WCAG 2.1 AA is widely recognized as the technical standard for evaluating website accessibility. While the WCAG itself is not a legal standard, the WCAG is the primary benchmark for evaluating whether a website provides equal access to people with disabilities. When a website fails to meet WCAG standards, it means that disabled individuals cannot independently access the site's content, features, or services.

28.     WCAG guidelines are divided into levels of compliance: Level A (pages with level A issues are unusable for some people); Level AA (pages with level AA issues are very difficult to use); and Level AAA (pages with level AAA issues can be difficult to use).

29.     Websites are generally expected to maintain compliance with WCAG 2.1 Level AA or higher to be considered accessible. Level A issues—issues that are unusable for some people—are unacceptable as they prevent proper use of a website.

30.     The accessibility barriers encountered by Plaintiff and described herein constitute violations of WCAG 2.1 Level A success criteria. The violations described in the following allegations reflect only those Level A barriers that Plaintiff personally encountered while using Defendant's Website and do not encompass the full range of accessibility failures on the Website. Defendant's Website may contain additional Level A violations beyond those described herein, as

F&S Law

6

well as additional violations of WCAG 2.1 Level AA success criteria, the full scope of which will be determined through discovery and expert analysis.

31. WCAG 2.1, Success Criterion 4.1.2 mandates that all user interface components have identifiable names and roles for assistive technology. Success Criterion 2.4.1 requires that webpage regions be organized so that users can skip repetitive content and navigate directly to their desired sections. On 7-Eleven's website, the page regions were improperly labeled, causing the screen reader to announce multiple sections with identical or meaningless names.

32. Because the landmark regions were indistinguishable from one another, Plaintiff could not efficiently navigate to the section of the page they were looking for and was forced to listen to the entire page sequentially.

33. WCAG 2.1 Success Criterion 2.4.4 requires that the purpose of each link be determinable from the link text alone, or from the link text together with its surrounding context. Numerous links on the Website used generic or non-descriptive text that provided no indication of where the link would lead or what content it would open.

34. Because Plaintiff navigates links by listening to link text read aloud by VoiceOver, they were unable to distinguish between links or make an informed choice about which to select, forcing them to either activate links without knowing their destination or skip them entirely.

35. WCAG 2.1 Success Criterion 4.1.2 also requires that interactive elements, such as buttons and form controls, have programmatically associated labels so assistive technology can announce their purpose. On 7-Eleven's Website, many interactive elements lacked these labels.

36. When Plaintiff's screen reader focused on these elements, it announced only generic information such as "button" or "link" with no further description, leaving Plaintiff unable to determine the element's purpose before activating it.

7

37. WCAG 2.1 Success Criterion 1.1.1 requires that all non-text content, including and especially images, have a text alternative that describes their purpose. Success Criterion 2.4.4 further requires that image links describe their destination. The Website presented many images as clickable links, with no alternative text indicating where the links would lead.

38. When Plaintiff's screen reader reached the image links, it announced a raw file name or nothing at all, rather than a meaningful description of the link's destination.

39. As a result, Plaintiff was forced to either guess or forgo content that sighted users could access simply by looking at the image.

40. WCAG 2.1 Success Criterion 4.1.2 requires that interactive elements accurately convey their function, including having a valid destination when the interactive element is implemented as a link. Certain interactive elements on the Website presented and announced as links but were not associated with any actual destination.

41. When Plaintiff activated these links, expecting to be taken to a new section or page of the website, nothing happened. This confused and prevented the Plaintiff from accessing their intended content.

42. WCAG 2.1 Success Criterion 2.5.3 requires that where an interactive element presents with a visible text label, that same text must be included in the element's programmatically determined accessible name.

43. Plaintiff encountered interactive elements on the Website that displayed one label visually but were programmed with a different, or absent, accessible name. Because the announced name did not match what was visually displayed, Plaintiff was provided with names for elements that did not accurately reflect the elements' purposes, further depriving Plaintiff of the information necessary to navigate the Website meaningfully.

F&S Law

8

44.    WCAG 2.1 Success Criterion 3.2.2 requires that activating any user interface component will not cause an unexpected change of context unless the user has been advised of the behavior beforehand. Several links on the Website opened new browser tabs without any prior warning or announcement to the user.

45.    When this occurred, Plaintiff's browser "Back" button became non-functional, as the button does not navigate back from a newly opened tab.

46.    Plaintiff was unaware that a new tab had opened and repeatedly attempted to use the "Back" function with no response. This caused disorientation and forced them to stop and troubleshoot rather than continue navigating the Website.

47.    This error is particularly acute for blind users. Blind users experience websites sequentially, element by element, as read aloud by their screen reader. Throughout this process, blind users build a mental roadmap of the page: the location of navigation menus (e.g., headers and banners), the structure of content sections, the placement of interactive elements, and the relationships between them. The mental roadmap is equivalent to a sighted user's visual overview and is essential for efficient, independent navigation.

48.    When a new tab opens silently, Plaintiff's carefully constructed mental roadmap of the prior page, and Website at large, is severed without warning. Plaintiff is transported to a new, unfamiliar context without any announcement that anything has changed.

49.    WCAG 2.1 Success Criterion 4.1.2 further mandates that all interactive elements present with a descriptive accessible name that allows users to understand their purpose. Numerous interactive elements on the Website, including buttons and navigation controls, had no descriptive accessible name whatsoever.

50.     These interactive elements were announced only as "button" or "image" with no additional context. Plaintiff had no basis or context to understand what the button would do or what the image was purported to depict.

51.     WCAG 2.1 Success Criterion 4.1.2 also requires that the current state of interactive elements, such as whether a checkbox is checked, a toggle is on, or an option is selected, be programmatically determinable and announced by assistive technology (Plaintiff's VoiceOver).

52.     Plaintiff encountered multiple checkboxes, toggles, and selection controls that did not identify their current state. Plaintiff's VoiceOver did not confirm whether interactive elements were successfully activated, whether an option was selected, or whether a feature was toggled on or off.

53.     Without feedback regarding the interactive element state, Plaintiff could not determine whether their inputs were registering, forcing them to repeat actions or abandon them entirely.

54.     WCAG 2.1 Success Criterion 4.1.2 requires that interactive elements be assigned a programmatic role that accurately reflects how the interactive element behaves. For example, buttons should behave as buttons to perform a certain action, and links should perform as links.

55.     Plaintiff encountered numerous improperly formatted interactive elements, causing them to be announced as buttons by VoiceOver when the buttons actually functioned as links.

56.     Plaintiff, expecting the interactive elements to function as buttons, was disoriented when the buttons functioned as links and navigated them away from the page without warning. This role mismatch deprived Plaintiff of the ability to predict how the interactive element would behave and further contributed to their overall navigational difficulty on the Website.

F&S Law

57.     The accessibility violations identified by Plaintiff and confirmed through technical and manual testing are not difficult or expensive to remediate. Adding a main landmark, implementing skip navigation, providing alternative text for images, and adding accessible names to interactive elements are elementary accessibility requirements. These violations demonstrate that Defendant has either: (1) failed to implement any meaningful accessibility testing or quality assurance for its Website, or (2) knowingly published and maintained a Website with known accessibility barriers.

58.     Requiring Plaintiff to complete a transaction by calling Defendant's store location or relying on sighted assistance rather than through the Website—the method readily available to non-disabled customers—does not satisfy Defendant's obligations under the PWDCRA or ADA. The law requires equal access, not separate and inferior alternatives. Plaintiff is entitled to the same independence, convenience, privacy, and ability to order items that the Website provides to sighted users.

59.     Defendant has not provided full and equal access to enjoyment of the goods, services, facilities, privileges, advantages, and accommodations provided by and through the Website and the physical places of public accommodation at which Defendant's goods are sold, in contravention of the PWDCRA and ADA.

60.     Places of public accommodation under the PWDCRA and ADA must ensure that their goods or services are fully and equally provided to individuals with disabilities, who shall not be discriminated against solely based on disability.

61.     The purpose of the PWDCRA and ADA is to provide an equal opportunity for individuals with disabilities to participate in all aspects of American civic and economic life. That mandate extends to internet e-commerce websites, including Defendant's Website.

F&S Law

11

62.     Plaintiff is a disabled individual who is interested in patronizing and intends to access the Website once the Website's access barriers are removed or remedied.

63.     Plaintiff, like millions of other visually impaired and blind individuals, finds that inaccessible websites create significant barriers to participating in commerce on equal terms. Online shopping/ordering provides independence, privacy, and convenience that are particularly valuable to individuals with disabilities. Defendant has not provided its product information and online ordering functionality in any digital format accessible to blind and visually disabled individuals using screen reader software.

64.     Plaintiff's inability to independently access and use Defendant's Website caused Plaintiff significant emotional distress and dignitary harm. Specifically:

a.   Plaintiff felt humiliated when they could not navigate the basic structure of the Website because its page regions were identically or meaninglessly labeled, forcing Plaintiff to listen to the entire page sequentially from beginning to end; a burden that sighted users never face because they can instantly scan a page's layout.

b.   Plaintiff experienced frustration and confusion when interactive elements across the Website failed to announce their purpose, their state, or the consequences of activating them, leaving Plaintiff repeatedly unable to determine whether their actions were registering or whether the Website was functioning at all.

c.   Plaintiff felt disoriented and excluded when links on the Website opened new browser tabs without warning, destroying the mental roadmap Plaintiff had carefully constructed through sequential navigation and rendering the browser's "Back" function useless, leaving Plaintiff unable to determine where they were, how they got there, or how to return to where they had been.

d.   Plaintiff felt marginalized when they encountered links that led nowhere, interactive elements that announced themselves incorrectly, and images that provided no description: errors that collectively communicated that Defendant had not considered blind users when designing or maintaining the Website.

e.   Plaintiff's disability already requires them to navigate a world not designed for their needs. Defendant's failure to implement basic accessibility features, technology, and standards that have existed for decades and are required by law, compounded Plaintiff's sense of isolation and demonstrated Defendant's indifference to their civil rights.

12

65.     Plaintiff has been denied the full enjoyment of the facilities, goods, and services of https://www.7-eleven.com, and deprived of the opportunity to participate and enjoy Defendant's goods and services on equal terms with non-disabled customers as a result of accessibility errors encountered on the Website.

66.     The barriers that exist on the Website resulted in discriminatory and unequal treatment of individuals with visual disabilities, including Plaintiff.

67.     These injuries are ongoing. Each time Plaintiff or other blind users attempt to use Defendant's Website to browse Defendant's products or place an order, they encounter the same systemic barriers. Because Defendant's Website serves as the primary gateway to Defendant's products and facilitates direct-to-consumer ordering, Defendant's ongoing violations constitute continuing and recurring injuries that will persist absent remediation of Defendant's Website.

## COUNT I – VIOLATION OF THE PWDCRA

68.     Plaintiff incorporates by reference paragraphs 1 through 67 as if fully stated herein.

69.     Plaintiff is an individual with a visual impairment that substantially limits a major life activity and qualifies as a disability within the meaning of the PWDCRA.

70.     The PWDCRA guarantees the opportunity to obtain the "full and equal utilization of public accommodations" without discrimination as a civil right. MCL 37.1102(1).

71.     A place of public accommodation means a business, educational institution, refreshment, entertainment, recreation, health, or transportation facility of any kind, whether licensed or not, whose goods, services, facilities, privileges, advantages, or accommodations are extended, offered, sold, or otherwise made available to the public. MCL 37.1301(a).

72.     Defendant's company-owned and franchisees' places of business are places of public accommodation under the PWDCRA because they are businesses whose goods, services,

F&S Law

13

facilities, privileges, advantages, or accommodations are extended, offered, sold, or otherwise made available to the public. MCL 37.1301(a).

73.    Defendant's Website is also a place of public accommodation under the PWDCRA because it provides the general public with the ability to locate and learn about Defendant's physical locations and/or services available at Defendant's physical locations. The Website is thus an extension of, gateway to, and an intangible "service, privilege, and advantage" of Defendant's physical places of public accommodation within the meaning of MCL 37.1302(a).

74.    The PWDCRA expressly states:

except where permitted by law, a person shall not…deny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodation of a place of public accommodation or public service because of a disability that is unrelated to the individual's ability to utilize and benefit from the goods, services, facilities, privileges, advantages, or accommodations or because of the use by an individual of adaptive devices or aids (e.g., screen-reading software). MCL 37.1302(a).

75.    Defendant's Website functions as an essential gateway to Defendant's places of public accommodation because it is the primary means by which prospective customers, including Plaintiff, can access information regarding Defendant's goods, services, facilities, privileges, and accommodations.

76.    Because Defendant's Website provides information about Defendant's goods and services and functions as the essential digital gateway to Defendant's physical places of business (i.e., its franchisees), there is a nexus between the Website and Defendant's physical places of business.

77.    The PWDCRA applies to all aspects of the provision of goods and services by a place of public accommodation, including the use of digital platforms when those digital platforms

14

are directly connected to the corresponding physical facilities and are essential to accessing and utilizing the facilities' services.

78.    Defendant's Website is designed, constructed, managed, operated, and/or maintained in a manner that is inaccessible to Plaintiff and other similarly situated individuals because it is not compatible with commonly used screen-reader software. The accessibility errors on Defendant's Website make the goods and services offered therein unavailable to Plaintiff and have deterred Plaintiff from visiting Defendant's physical locations.

79.    Defendant's Website contains specific, remediable barriers that contravene widely recognized accessibility standards as identified in detail above. The accessibility barriers directly denied Plaintiff the full and equal enjoyment of Defendant's goods and services by materially burdening tasks that sighted users can perform routinely.

80.    Plaintiff attempted to use Defendant's Website on February 28, 2026. Because of the accessibility errors described in detail above, Plaintiff was unable to complete an online transaction. This constituted an unlawful denial of equal access to Defendant's goods, services, and accommodations.

81.    As a direct and proximate result of Defendant's unlawful denial of equal access, Plaintiff has been denied the full and equal enjoyment of Defendant's goods, services, and accommodations. Plaintiff has suffered and continues to suffer both economic and dignitary harms, including:

   a. Loss of independence and autonomy when forced to rely on sighted assistance to browse or obtain the full benefit of Defendant's Website;

   b. Humiliation, embarrassment, and emotional distress from being excluded from services readily available to non-disabled customers;

   c. Frustration and wasted time attempting to navigate an inaccessible website;

F&S Law

15

d. Exacerbation of their sense of social exclusion and marginalization as a person with disabilities;

e. Denial of the dignity and the right to make independent consumer decisions.

82. These harms are ongoing and will persist until Defendant remediates its website.

83. Plaintiff is entitled to monetary relief for emotional injuries and reasonable attorney's fees under MCL 37.1606 as a result of Defendant's denial of equal access.

WHEREFORE, Plaintiff respectfully requests this Court grant the following relief:

a. Damages for the dignitary harms, emotional distress, frustration, humiliation, embarrassment, loss of independence, and exacerbated feelings of segregation and exclusion Plaintiff has suffered and continues to suffer as a direct result of Defendant's unlawful denial of equal access;

b. An award of reasonable attorney fees, costs, and litigation expenses;

c. Pre- and post-judgment interest;

d. Any other relief as the Court deems fair and just.

### COUNT II – VIOLATION OF THE ADA

84. Plaintiff incorporates by reference paragraphs 1 through 83 as if fully stated herein.

85. Defendant operates a place of public accommodation within the meaning of 42 U.S.C. §12181(7)(B) and 42 U.S.C. § 12181(7)(E), because it is a "restaurant, bar, or other establishment serving food and drink" and/or "a grocery store…shopping center, or other sales or rental establishment" and is therefore subject to Title III of the ADA.

86. Section 302(a) of Title III of the ADA, 42 U.S.C. § 12101 et seq., provides: "No individual shall be discriminated against based on disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

16

87.      Defendant's Website is covered under Title III of the ADA because it provides the general public with the ability to locate and learn about the physical places of business at and through which Defendant's goods and products are sold. The Website is an extension of, gateway to, and intangible "service, privilege, and advantage" of the same physical locations. It is therefore a covered service of a place of public accommodation under 42 U.S.C. § 12182(a).

88.      Under Title III of the ADA, 42 U.S.C. §12182(b)(1)(A)(II), it is unlawful discrimination to deny individuals with disabilities or a class of individuals with disabilities an opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations that are equal to the opportunities afforded to other non-disabled individuals.

89.      Specifically, under Title III of the ADA, 42 U.S.C. §12182(b)(2)(A)(II), unlawful discrimination includes, among other things, "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodations."

90.      In addition, under Title III of the ADA, 42 U.S.C. §12182(b)(2)(A)(III), unlawful discrimination includes, among other things, "a failure to take such steps, as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the goods, services, facilities, privileges, advantages, or accommodations being offered or would result in an undue burden."

F&S Law

17

91.    Defendant's non-compliant Website denies blind and visually impaired individuals full and equal access to, and enjoyment of, the goods, information, and services that Defendant has made available to the public on the Website and in its physical locations in violation of 42 U.S.C. §12101, et seq, and as prohibited by 42 U.S.C. §12182, et seq.

92.    Defendant has made insufficient material changes or improvements to the Website to enable its full and equal use and enjoyment by, and accessibility to, blind and visually disabled persons such as Plaintiff.

93.    Violations may be present and on other pages of the Website, which can and will be determined and proven through the discovery process in this case.

94.    There are readily available, well-established guidelines on the internet for making websites accessible to the blind and visually disabled. Other business entities have followed these guidelines in making their websites accessible. Incorporating basic accessibility improvements as described in WCAG 2.1 AA would neither fundamentally alter the nature of Defendant's business nor would they result in an undue burden on Defendant.

95.    Defendant's Website is substantially noncompliant with internationally accepted guidelines regarding digital accessibility and, as a result, fails to be perceivable, operable, robust, understandable, or accessible by blind and/or visually disabled individuals such as Plaintiff.

96.    Defendant has and continues to violate the ADA by denying access to the Website to individuals such as Plaintiff with visual disabilities who require the assistance of screen reader software to comprehend and access internet websites. The violations within the Website are ongoing.

97.    Part 36 of Title 28 of the C.F.R. was designed and implemented to effectuate subtitle A of Title III of the ADA, which prohibits discrimination based on disability by public

F&S Law

18

accommodations, and requires places of public accommodation to be designed, constructed, and altered in compliance with the accessibility standards established by Part 36.

98.     Defendant's Website has not been designed to interface with the widely and readily available technologies that can be used to ensure effective communication and thus violates the ADA.

99.     Regulatory guidance confirms that Title III specifically requires that places of public accommodation provide effective communication via auxiliary aids and services to individuals with disabilities. According to 28 C.F.R. §36.303(b)(1), auxiliary aids and services include "voice, text, and video-based telecommunications products and systems."

100.    28 C.F.R. §36.303(b)(2) specifically states that screen reader software is an effective method of making visually delivered material available to individuals who are blind or have low vision.

101.    Public accommodations must furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities: "To be effective, auxiliary aids and services must be provided in accessible formats, promptly, and in such a way as to protect the privacy and independence of the individual with a disability," 28 C.F.R. §36.303(c)(1)(ii).

102.    As a direct and proximate result of Defendant's failure to provide an ADA-compliant Website with a nexus to its brick-and-mortar locations, Plaintiff has suffered an injury-in-fact by being denied full and equal access to, and enjoyment of, Defendant's Website and the corresponding physical facilities. Plaintiff has experienced dignitary and emotional harms, including frustration, humiliation, and loss of independence. Because of the inadequate

F&S Law

development and administration of the Website, Plaintiff is entitled to injunctive relief pursuant to 42 U.S.C. §12133 to remedy the ongoing disability discrimination.

103.    This Court is vested with the authority to grant Plaintiff appropriate and necessary injunctive relief.

104.    Plaintiff is entitled to recover their reasonable attorney's fees, costs, and expenses pursuant to the ADA.

WHEREFORE, Plaintiff requests entry of judgment in their favor and against Defendant for the following relief:

a.   A permanent injunction to prohibit Defendant from violating the Americans with Disabilities Act, 42 U.S.C. §§ 12182, et seq.;

b.   A permanent injunction requiring Defendant to take the steps necessary to make its Website fully compliant with the requirements outlined in the ADA and its implementing regulations, so that the Website is readily accessible to and usable by blind individuals;

c.   An award of costs and expenses of this action, together with reasonable attorneys' and expert fees; and

d.   Such other and further relief as this Court deems fair and just.

March 26, 2026

/s/ *William R. Frush Jr.*
F&S LAW, PLLC
77 Monroe Center St. NW Suite 600
Grand Rapids, MI 49503
(248) 675-9192
wfrush@fslawpllc.com
P87016

F&S Law

20